# EXHIBIT 4

# FullContact Services Agreement

This Services Agreement (this "Agreement"), is effective between FullContact, Inc. ("FullContact") and the organization agreeing to these terms ("Client").

## 1. Definitions

- **"API"** means the application program interface software in source code or executable code form, and any modified, updated, or enhanced versions of such software through which FullContact Data may be accessed under this Agreement.

- **"Applicable Laws"** means applicable federal, state, local and foreign laws and regulations (including without limitation laws regarding the import or export of data or software and privacy).

- **"Client Application"** means the manner in which Client uses and distributes FullContact Data as described in an Order Form, which may include, but not limited to, the use or distribution of FullContact Data or Data Output through software applications or Internet web-based services or through electronic or written files or reports, in each case provided to End Users by Client.

- **"Client Privacy Policy"** means Client's conspicuously posted privacy policy that is associated with any commercially available website or application operated by Client, including the Client Application.

- **"Data Output"** means any data, reports, analysis or other output developed by or on behalf of Client that are derived from FullContact Data.

- **"End User"** means any authorized user of a Client Application who is an employee, independent contractor or other authorized representative (a) of a third party client, customer or licensee of Client who has access to or to whom FullContact Data or Data Output is distributed or resold; or (b) of Client who is authorized to access and use FullContact Data for Client's internal business purposes.

- **"End User Agreement"** is defined in Section 4.b hereof.

- **"FullContact Data"** means Public Data and/or data from third party sources that are provided to Client by FullContact as part of the FullContact Data Services.

- **"FullContact Data Services"** means those data enhancement, enrichment, analysis, research and other data services, and any implementation, training, configuration, data migration and other related professional services performed by or on behalf of FullContact, including those services provided to Client hereunder as described in any applicable Order Form.

- **"FullContact Privacy Policy"** means the FullContact privacy policy located at **Privacy Policy**.

- **"Marks"** means the service marks, trademarks, trade name, logos and symbols used by a party to promote its goods or services.

- **"Order Form"** means the FullContact ordering document that refers to this Agreement and is executed from time-to-time by authorized representatives of both parties, and that describes:
    - The FullContact Data Services and the FullContact Data to be provided;

- The Subscription Term;
- The access methods through which the Submitted Information, if any, and FullContact Data are provided;
- Any applicable restrictions or limits on use of the FullContact Data or APIs;
- The payments and fees payable to FullContact for the FullContact Data Services;
- The approved use cases required by Section 3.c. below; and any additional terms as agreed upon by FullContact and Client.

- **"Personal Data"** means data through which an individual may be identified or contacted, including, without limitation, names, addresses, telephone numbers, email addresses, as well as any other non-public information about an individual that is associated with or linked to any of the foregoing data, but excluding any data in encrypted or hashed form.
- **"Public Data"** means information that FullContact collects from publicly available sources.
- **"Subscription Term"** means the term of any subscription to FullContact Data Services per an Order Form.
- **"Submitted Information"** means Personal Data, if any, that Client submits to FullContact by the means described in an Order Form in connection with the FullContact Data Services.

## 2. Services and Scope of Agreement

In consideration for the fees set forth in each Order Form, FullContact will provide the FullContact Data Services and the FullContact Data, to Client pursuant to this Agreement and each Order Form entered into in accordance with the terms of this Agreement, which upon execution by authorized representatives of each party, will be attached to, and become an integral part of this Agreement.

## 3. Licenses and Restrictions.

- **Data Licenses.** In accordance with the specifications of the Client Application set forth in an Order Form and subject to the terms and conditions of this Agreement, including the limits and restrictions set forth in Section 3.b. and in the Order Form, during the applicable Subscription Term FullContact hereby grants to Client a limited, non-exclusive, non-transferable, license: (i) to create Data Output based on FullContact Data; (ii) to integrate, reproduce and use the FullContact Data as an integral part of the Client Application; (iii) to resell, distribute and display FullContact Data and Data Output to authorized End Users through or as part of the Client Application strictly for internal use by such End Users, and not for resale or further distribution by such End Users or to provide services to any third party; and (iv) if the methods through which FullContact Data are provided to Client involve use of APIs within the Client Application, to use and access the API pursuant to the API License Terms set forth in Exhibit A attached hereto. If the FullContact Data is made commercially available by Client to external End Users through a Client Application, then the rights and limitations applicable to distribution of the Client Application will be specified in the applicable Order Form and included in the End User Agreement. Client shall remain fully responsible for any breach of the terms of this Agreement by any End Users or any permitted third party through which any such Client Application is distributed, licensed or sold.

- **Restrictions.** Client will not use, and will require any End Users not to use, FullContact Data (i) for cookie tracking, ad exchanges, ad networks, data brokerages, or sending electronic communications (including email) in violation of Applicable Law; (ii) to determine any person's employability, credit worthiness, credit standing, credit capacity, or other characteristics related to such person's manner or mode of living, as listed in Section 603(d) of the Fair Credit Reporting Act; or (iii) in any manner that exceeds the scope of the licenses granted hereunder or the limits or restrictions set forth in an Order Form, including any use of FullContact Data that has not been approved by FullContact in an Order Form as required by Section 3.c. As a condition to the licenses granted to Client hereunder, Client agrees that at all times during the Subscription Term the Client Application must provide significantly additional data, content and functionality than that provided by the FullContact Data alone. The licenses granted herein will be further subject to those limits and restrictions set forth in an Order Form, specific use case limitations, rate restrictions, data cache limits or limits on the permissible number of API calls.

- **Approval of Use Case.** Prior to use of any FullContact Data in a Client Application, Client will submit to FullContact a proposal outlining the use of FullContact Data into the Client Application. FullContact must approve the integration of the FullContact Data into the Client Application for such uses by incorporating such usage terms into a signed Order Form: (i) before initial launch of each Client Application; (ii) before launch of any new Client Application or material change to an existing Client Application, including without limitation allowing any elevated access to FullContact Data in a previously-approved Client Application; and (iii) before any changes are made to the Client Application if such changes expand the use of FullContact Data beyond the originally approved Client Application. If FullContact does not sign such Order Form with the included usage terms, then Client will not be permitted to integrate and use the FullContact Data for such uses.

## 4. Application Policy and Standards.

If the FullContact Data is made available by Client through a Client Application, then the following provisions apply:

- **Client Application Policy.** Client is solely responsible and liable for the Client Application and for supporting the Client Application. The Client Application shall not: (i) violate any third-party rights (including any intellectual property rights), any Applicable Laws (including any privacy laws), the Client Privacy Policy (if applicable), or any of the restrictions set forth in Section 3.b hereof; (ii) contain any tortious, threatening, harmful, defamatory or intentionally misleading, pornographic, obscene, or patently offensive content; (iii) promote racism, bigotry, hatred, or physical harm of any kind against any group or individual; (iv) knowingly transmit or introduce any computer viruses, worms, or any software intended to interfere with, damage or alter a computer system or data; or (v) harvest, collect, gather or assemble information or data regarding any End User or other individuals, including email addresses, without their consent (collectively, the "FullContact Application Policy"). FullContact shall have the right, but not the obligation, at any time to monitor or review the Client Application at any time and may reject the Client Application and immediately cease to provide FullContact Data for use in the Client Application if it determines, in good faith, that such Client Application does not comply with the FullContact Application Policy or does not satisfy any of the other criteria or requirements set forth herein. Strict compliance with this section is a condition of the licenses in this Agreement and a material requirement of this Agreement.

- **End User Agreement.** If the FullContact Data is made available by Client to external End Users through a Client Application, the Client Application shall be licensed or made available to such End Users pursuant to a binding written agreement between Client and End User that includes the following terms (the "End User Agreement"): (i) the End User agrees not to use any FullContact Data (whether alone or in combination with any other data) in any manner that violates the FullContact Application Policy, or any of the restrictions set forth in Section 3.b hereof or the applicable Order Form; (ii) the End User agrees to provide commercially reasonable physical and logical security controls to prevent security breaches or unauthorized access to FullContact Data that End User is authorized to download from the Client Application; (iii) except as otherwise set forth in an Order Form, all rights to FullContact Data are limited to use within the Client Application; (iv) all rights to FullContact Data automatically terminate upon termination of the applicable Subscription Term or upon the earlier termination of the applicable Order Form or this Agreement; (v) the End User agrees to delete all FullContact Data upon termination of the license, other than any Data Output that has been derived from FullContact Data in compliance with the terms of this Agreement prior to the termination or expiration date; and (v) if Submitted Information is provided to FullContact by Client, the End User grants to Client all rights (including consents and licenses) to any Submitted Information that the End User provides to Client that are necessary for Client to grant FullContact the license to use its Submitted Information (as described in Section 5.a of this Agreement).

- **Attribution of Source and Use of Marks.** If specified in an Order Form, Client may be required to provide attribution to FullContact as the source of the FullContact Data within the Client Application in a form and manner to be agreed to by the parties. In addition, the parties may conduct joint marketing and promotional activities for the Client Application and, if so, the parties will mutually agree in writing to all terms and conditions applicable to the use of each party's Marks directly applicable to such purposes. Except as expressly authorized in an applicable Order Form, neither party will make any use of the other party's Marks in any manner, including any manner that dilutes, tarnishes or undermines the value of the other party's Marks. Any press release or other publicity announcing or referring to this Agreement or the relationship between the parties, including identification of either party's website, shall be subject to the prior written approval of the other party.

# 5. Submitted Information.

If Client provides FullContact any Submitted Information, the following provisions shall apply to such Submitted Information.

- **License to Submitted Information.** Client hereby grants FullContact a perpetual, irrevocable, non-exclusive, royalty-free, transferable license to reproduce and use Submitted Information in connection with the provision of FullContact Data Services to FullContact's customers generally, provided that FullContact will (i) not resell or distribute any Submitted Information that is not Public Data to any third party; (ii) handle all Submitted Information that is comprised of Personal Data in the same manner as required for "Personal Data" under the terms of the FullContact Privacy Policy; and (iii) not disclose that Client is the source of any Submitted Information or any connection between any individual who is the subject of Submitted Information and any products or services provided by Client.

- **Submitted Data Representations.** Client represents and warrants to FullContact that (i) if Submitted Information is collected from customers or users of any Client website or service, including End Users of a Client Application, Client will at all times maintain a Client Privacy Policy that is associated with or linked to the Client website, service and/or Client Application, which policy complies with all Applicable Laws and which clearly and accurately describes the processing, use and disclosure of Submitted Information as contemplated herein; (ii) Client has obtained or possesses all rights necessary, including any third party consents required under Applicable Laws, to authorize FullContact to use the Submitted Information for the purposes contemplated hereunder and to grant FullContact the licenses set forth under Section 5.a; (iii) Client's collection and disclosure of Submitted Information for the uses contemplated hereunder complies with all Applicable Laws and, if applicable, the Client Privacy Policy; and (iv) Client will promptly notify FullContact of any notice from (A) any governmental agency or regulatory authority alleging that the use of any Submitted Information violates Applicable Law, and/or (B) any individual whose Personal Data is included in the Submitted Information demanding deletion of any data included in the Submitted Information or challenging the use or accuracy of such data. Client agrees not to transmit or upload to FullContact, and the Submitted Information will not include, any individually identifiable health information (as that term is defined in accordance with Health Insurance Portability and Accountability Act, as amended), debit or credit card information, bank account information, social security number, driver's license information, or government ID information about any individual.

## 6. Confidentiality and Security Requirements.

- **Confidential Information.** Each party agrees that all business, technical and financial information that is designated as "Confidential" or "Proprietary," or is disclosed in a manner that a reasonable person would understand the confidentiality of the information disclosed are the confidential property of the disclosing party and its licensors ("Confidential Information"). The receiving party will hold in confidence and not use or disclose any Confidential Information of the disclosing party, except in connection with the exercise of rights granted or performance of such party's obligations under this Agreement. The receiving party shall not be obligated under this Section 6 with respect to information if the receiving party can document such information: (i) is or has become readily publicly available through no fault of the receiving party or its employees or agents; (ii) is received from a third party lawfully in possession of such information and the receiving party has no knowledge of any disclosure restrictions which prohibit such third party from disclosing such information; (iii) was rightfully in the possession of the receiving party without restriction prior to its disclosure by the other party; or (iv) was independently developed by employees or consultants of the receiving party without use of or reliance on such Confidential Information. The receiving party may disclose Confidential Information if it is compelled by law to do so, provided the receiving party gives the disclosing party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance if the disclosing party wishes to contest or limit such disclosure.

- **Security and Privacy of Personal Data.** Each party recognizes that any data received from the other party in connection with the FullContact Data Services may include Personal Data, which both parties desire to keep secure and free from unauthorized access or use. Accordingly, the receiving party shall (i) provide commercially reasonable physical and

logical security controls to prevent security breaches or unauthorized access to such Personal Data; (ii) promptly notify the disclosing party of any breaches, or other unauthorized activities relative to the use of such Personal Data of which it becomes aware; and (iii) maintain complete and accurate books and records of account with respect to all of its activities under this Agreement and all disclosures and transactions relating to such Personal Data during the term and for a period of at least two years after termination or expiration of this Agreement. Further, to the extent such Personal Data is considered "personal data" and is subject to regulation under the EU Data Protection Directive 95/46 or Swiss Federal Data Protection law, the receiving party shall either certify its compliance with the EU-U.S. and Swiss-U.S. Privacy Shield Framework administered by the International Trade Administration of the U.S. Department of Commerce (the "Privacy Shield") or contractually agree to provide at least the same level of protection for Personal Data as is required by the relevant Privacy Shield principles.

- **Security Audits.** Each disclosing party or its designee (the "Auditing Party") shall have the right at any time following the date of this Agreement, but no more than once every twelve (12) months, to audit the receiving party's use of Personal Data, security controls relative to the Personal Data and related activity logs during normal business hours upon ten (10) business days prior written notice to the receiving party. The foregoing notwithstanding, no such limitations on audit frequency or prior written notice shall be required if any governmental authority requires such audit. Before any Auditing Party's designee will be permitted access to the other party's applicable books and records hereunder, such designee must have signed and delivered to the party being subjected to audit a commercially reasonable confidentiality agreement. The nondisclosure obligations of this Section 6 shall apply to the Auditing Party with respect to all Confidential Information (including any Personal Data) reviewed or disclosed in any audit.

- **Injunctive Relief.** Each party acknowledges that any unauthorized use of the of the other party's Confidential Information under this Section 6 will cause irreparable harm and injury to the other party for which there is no adequate remedy at law. In addition to all other remedies available under this Agreement, at law or in equity, each party further agrees that the other party shall be entitled to seek injunctive relief in the event the other party is in breach or has violated the terms set forth in this Section 6.

## 7. Fees; Taxes.

Client will pay all fees applicable to the FullContact Data Services provided by FullContact set forth in each Order Form entered into by the parties. FullContact will periodically issue invoices to Client for all amounts payable, and such invoices shall be due and payable within fifteen (15) days after invoice date unless otherwise expressly provided in an Order Form. If Client fails to pay any past due invoice within ten (10) days after Client's receipt of a past due notice from FullContact, FullContact may revoke or suspend FullContact Data Services until such time as Client brings its account completely current. Any invoiced amounts not subject to a good faith dispute that are not paid when due will be subject to finance charges equal to 1.5% of the unpaid balance per month or the highest rate permitted by applicable law, whichever is less, determined and compounded monthly from the date due until the date paid. If Client fails to timely pay an invoice as set forth in this Section 7 or an in applicable Order Form on two (2) or more occasions, FullContact may, in addition to any other remedies that FullContact may have and upon written notice to Client, modify the payment terms to require pre-payment of any or all fees payable under any Order Forms then outstanding or entered into in the future, or require other assurances to secure Client's payment obligations hereunder.

Client must notify FullContact of any disputed amounts in any invoice (in writing) no later than thirty (30) days after the invoice date, otherwise the amount invoice shall be conclusively deemed correct by the parties. Other than net income taxes imposed on FullContact, Client will bear all taxes, duties, and other governmental charges with respect to the licenses and services provided under this Agreement. Client will reimburse any costs or expenses (including, but not limited to, collection agency fees, reasonable attorneys' fees and court costs) incurred by FullContact to collect any amount that is not paid when due upon receipt of an invoice therefor.

## 8. Term and Termination; Data Deletion; Survival.

- This Agreement will commence upon the Effective Date and continue until the applicable Subscription Term for each Order Form has expired, unless each Order Form is earlier terminated in accordance with the terms of the applicable Order Form or this Agreement is earlier terminated as set forth herein.

- Either party may terminate this Agreement, effective immediately upon written notice to the other party, if such party breaches any provision of this Agreement and does not cure the breach within thirty (30) days (or ten (10) days with respect to Client's payment obligations under Section 7) after receiving written notice thereof; provided, however, FullContact may terminate this Agreement, effective immediately upon written notice to Client without any opportunity to cure, if Client breaches any of the provisions of Sections 3.b, 4.a, 5.b or 6 hereof. Upon the termination of this Agreement for any reason, all Order Forms shall automatically terminate. Upon expiration of the Subscription Term or the earlier termination of this Agreement, all licensed rights granted in this Agreement to Client will immediately terminate.

- Upon termination or expiration of this Agreement, Client will irrecoverably delete, and shall cause any End Users to delete, any and all FullContact Data and Client will be required to execute the Data Deletion Acknowledgement in the form of Exhibit B attached hereto; provided that Client and any End Users will not be required to delete any data that was already in Client's possession prior to obtaining the same data from FullContact (as FullContact Data) hereunder, or any Data Output that has been derived from FullContact Data in compliance with the terms of this Agreement prior to the termination or expiration date. FullContact may, upon reasonable advanced notice to Client, audit Client's compliance with this requirement at any time within a two-year period following expiration or termination of this Agreement.

- Sections 5.a, 6, 8, 9, 10.c, 11 and 12, as well as Client's obligation to pay any fees applicable to the balance of the Client's then-current Subscription Term, will survive any expiration or termination of this Agreement for any reason.

## 9. Indemnity.

- **Indemnity by Client.** Client agrees to defend, indemnify and hold FullContact (and its officers, directors, employees, agents, successors and assigns) harmless from any claims, demands, actions, suits, investigations or proceedings brought by a third party ("Claims") and all resulting judgments, settlements, damages, losses, costs, fees (including reasonable attorneys' fees and court costs) and expenses ("Losses") due to or arising out of (i) Client's breach or violation of any of the terms of this Agreement or any breach of its representations or warranties set forth herein; and/or (ii) Client's violation of Applicable Laws (including any privacy laws) in connection with its activities hereunder or its use or

distribution of FullContact Data, excluding any such Claims to the extent based on or arising out of any cause or circumstance for which FullContact must indemnify Client under Section 9.b hereof. Client shall further indemnify FullContact (and its officers, directors, employees, agents, successors and assigns) from and against any Losses due to or arising out of Client's violation of the license terms and restrictions set forth in Section 3 and in any Order Form. As a condition of the above indemnity, at Client's expense, Client shall have the right to assume the exclusive control of the defense and settlement of any Claims and FullContact agrees to cooperate with its defense of such Claims; provided that Client will not agree to any settlement that grants any licenses, imposes any ongoing obligations on FullContact (other than the payment of money) or that does not include a general release of all claims against FullContact without the prior written consent of FullContact; provided further that if Client fails to assume the defense of such Claim or fails to diligently defend such Claim, FullContact may assume the control and defense of such Claim at Client's expense. FullContact will use reasonable efforts to notify Client of any such Claim promptly upon becoming aware of it.

- **Indemnity by FullContact.** FullContact agrees to indemnify and hold Client (and Client's officers, directors, employees, and agents) harmless from any Claims and resulting Losses incurred by Client that are due to or arising out of any allegation that Client's use of FullContact Data as provided to Client by FullContact hereunder in accordance with the terms and conditions of this Agreement, infringes or violates the rights of any third party (including any rights under applicable privacy laws), any Applicable Laws or the FullContact Privacy Policy; excluding any such Claims to the extent based on or arising out of any cause or circumstance for which Client must indemnify FullContact under Section 9.a hereof. As a condition of the above indemnity, at FullContact's expense, FullContact shall have the right to assume the exclusive control of the defense and settlement of any such Claim and Client agrees to cooperate with FullContact's defense of these Claims; provided that FullContact will not agree to any settlement that grants any licenses, imposes any ongoing obligations on Client (other than the payment of money) or that does not include a general release of all claims against Client without the prior written consent of Client. Client will use reasonable efforts to notify FullContact of any such Claim promptly upon becoming aware of it. In the event that any FullContact Data becomes subject to a Claim that is subject to the terms of this Section 9.b, FullContact shall at its option either (i) modify the FullContact Data so as to avoid any alleged infringement or violation; (ii) obtain any rights required to avoid such alleged infringement or violation; or (iii) terminate this Agreement or any Order Form with respect to such FullContact Data and refund to Client any prepaid fees applicable to the remainder of the then-current Subscription Term. THIS SECTION 9.B STATES FULLCONTACT'S ENTIRE LIABILITY AND CLIENT'S EXCLUSIVE REMEDY FOR ANY THIRD PARTY CLAIMS PERTAINING TO THE FULLCONTACT DATA.

## 10. Limited Warranty; Disclaimers.

- **Limited Service Warranty.** FullContact warrants during each applicable Subscription Term that: (i) it will use commercially reasonable efforts to provide the FullContact Data Service and the FullContact Data and any updates thereto in accordance with the requirements set forth in each Order Form; and (ii) if the methods through which FullContact Data are provided to Client involve use of FullContact APIs, the FullContact Data Service will meet the terms of the Service Level Agreement set forth in Exhibit C (the "SLA") in all material respects, subject to all limitations set forth in the SLA. As Client's sole remedy and

FullContact's sole liability for a breach of the foregoing warranties, FullContact shall either (A) re-perform the deficient FullContact Data Services or correct or replace any deficient FullContact Data, as applicable, or (B) provide those specific remedies set forth in Exhibit C for any failure to meet the terms of the SLA.

- **Data Warranty.** FullContact represents and warrants to Client that (i) FullContact will at all times maintain the FullContact Privacy Policy, which complies with all then-current Applicable Laws and which clearly and accurately describes the processing, use and disclosure of FullContact Data as contemplated herein; (ii) FullContact has obtained or possesses all rights necessary (including any third party consents required under Applicable Laws) to authorize Client to use the FullContact Data for the purposes contemplated hereunder and to grant Client the licenses set forth under Section 3.a; (iii) FullContact's collection and disclosure of FullContact Data for the authorized uses contemplated hereunder complies with all Applicable Laws and, if applicable, the FullContact Privacy Policy; and (iv) FullContact will promptly notify Client of any notice from (A) any governmental agency or regulatory authority alleging that the use of any FullContact Data violates Applicable Law, and/or (B) any third party or individual whose Personal Data is included in the FullContact Data demanding deletion of any data included in the FullContact Data or challenging the use or accuracy of such data.

- EXCEPT FOR THE WARRANTIES EXPRESSLY PROVIDED BY FULLCONTACT HEREUNDER, THE FULLCONTACT DATA AND FULLCONTACT DATA SERVICES ARE PROVIDED "AS-IS" AND "AS AVAILABLE" AND FULLCONTACT (AND ITS SUPPLIERS) EXPRESSLY DISCLAIM ANY WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, QUIET ENJOYMENT, OR NON-INFRINGEMENT. FULLCONTACT MAKES NO WARRANTY THAT FULLCONTACT DATA SERVICES (A) WILL MEET CLIENT'S REQUIREMENTS; OR (B) WILL BE AVAILABLE ON AN UNINTERRUPTED, FULLY SECURE, OR ERROR-FREE BASIS.

## 11. Limitation on Liability.

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY LOST PROFITS OR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE USE OF, OR INABILITY TO USE, ANY PRODUCTS, DATA OR SERVICES PROVIDED HEREUNDER, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, FULLCONTACT'S LIABILITY TO CLIENT FOR ANY DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT, FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO AMOUNTS CLIENT HAS PAID FULLCONTACT IN THE 12 MONTHS PRIOR TO THE DATE THE CLAIM FOR DAMAGES AROSE. THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE THIS LIMIT. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO A BREACH OF EITHER PARTY'S OBLIGATIONS UNDER SECTION 6 HEREOF, OR LIMIT EITHER PARTY'S OBLIGATIONS TO INDEMNIFY THE OTHER PARTY UNDER THE TERMS OF SECTION 9 HEREUNDER.

## 12. General.

- **Notices.** All notices issued under this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered, sent by any nationally recognized overnight courier service, electronic mail or by registered or certified mail, postage prepaid, to the following address or to such other person at such other address or may be designated by the parties hereto in writing and notice thereof duly given:

  If to Client, to the address set forth in the most recent Order Form. If to FullContact:

  FullContact, Inc.

  1200 17th Street

  Denver, Colorado 80202

  Attention: Chief Financial Officer

  Telephone: (888) 330-6943

  Email: contracts@fullcontact.com

- **Assignment.** Neither party may assign any rights or obligations arising under this Agreement, whether by operation or law or otherwise, without the prior written consent of the other; except that FullContact may assign this Agreement, without Client's consent, in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets. The parties agree and anticipate that FullContact may fulfill its obligations under this Agreement through subcontractors, including its third party cloud-based hosting provider. This Agreement shall inure to the benefit of and shall be binding on the permitted successors and assignees of the parties. Any attempted transfer or assignment hereof in violation hereof is null and void.

- **Force Majeure.** Except for the obligation to pay money, neither party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder on account of strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, governmental action, labor conditions, earthquakes, material shortages or any other cause which is beyond the reasonable control of such party.

- **Governing Law; Attorney's Fees.** This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado without giving effect to principles of conflict of laws that would require the application of the laws of a different jurisdiction. The United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. If a dispute arising under this Agreement results in litigation, the non-prevailing party shall pay the court costs and reasonable attorneys' fees of the prevailing party.

- **Waivers.** All waivers must be in writing. Any waiver or failure to enforce any provision of the Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

- **Severability.** If any provision of the Agreement is unenforceable, such provision will be changed and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect.

- **Independent Contractors.** Each party's relationship to the other is that of an independent contractor, and neither party is an agent of the other. Any use of the term "partner" herein or in any communication by or between the parties or on their individual or joint behalf to describe their relationship is intended solely in the colloquial sense of a valued business relationship, and does not indicate the existence of or an offer to enter into a legal partnership, joint agency, or other relationship involving common ownership or joint and/or several liability. Neither party will have, and will not represent to any third party that it has, any authority to act on behalf of the other party.

- **Entire Agreement.** This Agreement, the Exhibits attached hereto and each Order Form entered into by the parties constitutes the entire agreement between Client and FullContact and supersedes and replaces all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof. In the event of any conflict between this Agreement and the terms of any Order Form, this Agreement shall control unless the Order Form explicitly states that a particular provision supersedes a conflicting provision in this Agreement.

- **Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original, but all of which together will constitute the same instrument.

## Exhibit A - API License Terms

To the extent Client's access to FullContact Data is provided through FullContact APIs pursuant to the Services Agreement (the "Agreement") by and between Client and FullContact, of which this Exhibit A forms a part, as specified in an Order Form, the following terms shall apply. All capitalized terms not otherwise defined herein will have the meaning set forth in the Agreement:

As used in this Exhibit A:

**"API Documentation"** means the documentation and specifications for APIs that are published by FullContact from time-to-time at **https://docs.fullcontact.com/api**.

**"API Key"** means the code provided by FullContact that permits Client to access the API.

**API License.** Subject to the terms and conditions of this Agreement, during the applicable Subscription Term, or the earlier termination of the Agreement or any Order Form providing for the access by Client of the API, FullContact hereby grants to Client a limited, non-exclusive, non-transferable, license to: (a) use the API Key to access and incorporate the API as part of the Client Application; (b) internally use, perform, display, reproduce the API solely as necessary to develop, maintain and support the Client Application, in accordance with the specifications included in the API Documentation; and (c) to the extent permitted in Client's approved use case, reproduce and distribute copies of the API, in executable code form only, solely as incorporated into the Client Application to End Users pursuant to an End User License Agreement.

**Restrictions.** Client agrees not to (i) reverse engineer or attempt to extract the source code from any API or any related software, except to the extent that this restriction is expressly prohibited by Applicable Law; (ii) disclose, distribute, sublicense, lease, rent, loan, resell or otherwise transfer the API source code, the data received from the API (other than those elements incorporated into the Client Application) or the API Key to any third party; or (iii) use the API or API Keys in any manner that exceeds the scope of the licenses granted hereunder or the limits or restrictions set forth in an Order Form. Client must reproduce, on all copies made by or for Client, and must not remove, alter, or obscure in any way all proprietary rights notices (including copyright notices) of FullContact or its suppliers on or within the copies of the API. FullContact may, at its sole discretion, release subsequent versions of the API and require Client to obtain and use the most current version.

## Exhibit B - Data Deletion Acknowledgment

This Data Deletion Acknowledgment is being provided by ____ ("Client") pursuant to the requirements of that certain Services Agreement (the "Agreement") entered into by and between Client and FullContact, Inc. ("FullContact") upon expiration or termination of the Agreement. Capitalized terms not otherwise defined in this Acknowledgement have the meanings given such terms in the Agreement.

The undersigned hereby acknowledges that he/she has the authority to acknowledge on behalf of Client that Client has ceased to use and irrevocably deleted, and has caused any of its End Users to cease to use and irrevocably delete, all FullContact Data, other than data that was already in Client's possession prior to obtaining the same data from FullContact (as FullContact Data) under the Agreement, or any Data Output that has been derived from FullContact Data in compliance with the terms of the Agreement prior to the termination or expiration date of the Agreement. The undersigned further acknowledges that Client will grant any necessary access to Client's databases to FullContact personnel to verify the accuracy of this acknowledgement for the two-year period following the termination or expiration date of the Agreement.

# Exhibit C - Service Level Agreement

This Service Level Agreement ("SLA") applies to the FullContact Data Services provided to Client through FullContact APIs pursuant to the Services Agreement (the "Agreement") by and between Client and FullContact, to which this SLA is attached as an Exhibit and forms a part thereof. All capitalized terms not otherwise defined herein will have the meaning set forth in the Agreement.

1. **Uptime Commitment.** The FullContact Data Services will be available for 99.5% of the time during each calendar month ("Uptime"). Uptime will not include periods the FullContact Data Services are unavailable due to: (i) Routine Maintenance (defined below); (ii) Urgent Maintenance (defined below); (iii) the negligence, acts or omissions of Client or its End Users, any of the employees, contractors, or agents of Client or its End Users; (iv) the failure or malfunction of equipment, network, software, applications or systems not owned or directly controlled by FullContact; (v) any third party or public network or systems unavailability; (vi) circumstances or causes beyond the control of FullContact, including, without limitation, force majeure events and third party attacks on the FullContact network (such as ping and denial of service attacks); or (vii) Client's (or any End User's) breach of the terms of the Agreement, including this SLA (collectively, "Exclusions").

2. **Maintenance.** FullContact will occasionally perform modifications and upgrades to the FullContact Data Services ("Routine Maintenance"). Routine Maintenance ordinarily will not cause an interruption of the Services, but it may increase the risk of an interruption. FullContact will make reasonable efforts to limit interruption to no more than 15 minutes in any calendar week, and to limit Routine Maintenance to two hours in any calendar week. FullContact will also strive to schedule Routine Maintenance during times that have the least potential impact on Client. If FullContact determines that immediate maintenance on the Services is required ("Urgent Maintenance"), FullContact can perform such Urgent Maintenance at any time and for any period of time (as determined by FullContact), and FullContact will provide Client with notice of Urgent Maintenance as soon as reasonably practicable under the circumstances.

3. **Remedy.** If FullContact does not meet the Uptime commitment set forth above for a given calendar month, FullContact will, as its sole obligation therefor and Client's sole remedy, provide a credit to Client that equals half of Client's invoice for the FullContact Data Services in the immediately previous calendar month; provided that credits will not be offered if the FullContact Data Services are unavailable as a result of any of the Exclusions enumerated above.